**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KYLE MAYAN, *et al.*, | : | COLLECTIVE ACTION |
| | : | (CIVIL) |
| *Plaintiffs*, | : | |
| | : | No. 07-2658 |
| v. | : | |
| | : | |
| RYDBOM EXPRESS, INC. | : | |
| and DOUGLAS H. RYDBOM, | : | The Honorable Lawrence F. Stengel |
| | : | |
| *Defendants*. | : | NON-JURY TRIAL |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT
(November 14, 2008)**

---

Todd J. Shill, Esq. (ID No. 69225)
John R. Martin, Esq. (pro hac vice)
Rhoads & Sinon LLP
One South Market Square, 12th Floor
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
tshill@rhoads-sinon.com
jmartin@rhoads-sinon.com

*Attorneys for Defendants*

720305.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF UNDISPUTED FACTS .................................................. 1

III.    PROCEDURAL HISTORY ............................................................................... 4

IV.     STATEMENT OF QUESTIONS PRESENTED ......................................... 4

V.      ARGUMENT ........................................................................................................ 5

        A.      Overview: The Motor Carrier Act Exemption ............................................. 5

        B.      The Motor Carrier Act Exemption prior to August 10, 2005 ......................... 9

                1.      Rydbom was a "motor carrier" pursuant to 49 U.S.C. § 31502
                        prior to the enactment of SAFETEA-LU. .............................................. 9

                2.      Mayan and the opt-in Plaintiffs were "employees" pursuant to
                        49 U.S.C. § 31502 prior to the enactment of SAFETEA-LU. ............. 10

        C.      The Motion Carrier Act Exemption on and after August 10, 2005, but before
                June 6, 2008 ................................................................................................. 11

                1.      Rydbom remained a "motor carrier" pursuant to 49 U.S.C. §
                        31502 after the enactment of SAFETEA-LU. .................................... 12

                2.      Mayan and the opt-in Plaintiffs remained "employees"
                        pursuant to 49 U.S.C. § 31502 after the enactment of
                        SAFETEA-LU. .................................................................................. 14

                3.      Case law supports Rydbom's argument. ............................................. 15

                4.      Policy and common sense support Rydbom's argument. .................... 18

        D.      The Motor Carrier Act Exemption after June 6, 2008 ................................. 19

                1.      The "covered employee" provision of the Technical Corrections Act
                        cannot be applied retroactively. ........................................................ 20

                2.      The "covered employee" provision of the Technical Corrections Act
                        does not apply to the eight opt-in Plaintiffs employed by Rydbom
                        after June 6, 2008. .............................................................................. 21

        E.      The Motor Carrier Exemption as applied to the PMWA ............................. 24

VI.     CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASE LAW:**

<u>Bilyou v. Dutchess Beer Distribs., Inc.</u>, 300 F.3d 217 (2d Cir. 2002) ........................................ **10**

<u>Friedrich v. U.S. Computer Servs.</u>, 974 F.2d 409 (3d Cir. 1992) ................................................ **5**

<u>In re Air Crash Disaster Near Peggy's Cove</u>, 210 F. Supp. 2d 570 (E.D. Pa. 2002) .................. **14**

<u>Kautsch v. Premier Commc'ns</u>, 502 F. Supp. 2d 1007 (W.D. Mo. 2007)................................... **22**

<u>Levinson v. Spector Motor Serv.</u>, 330 U.S. 649 (1947) ........................................................ **5, 10**

<u>Morris v. McComb</u>, 332 U.S. 422 (1947)................................................................................**5, 10, 24**

<u>Packard v. Pittsburgh Transp. Co.</u>, 418 F.3d 246 (3d Cir. 2005)................................................. **5**

<u>Southland Gasoline Co. v. Bayley</u>, 319 U.S. 44 (1943) ............................................................ **10**

<u>Tidd v. Adecco USA, Inc.</u>, No. 07-11214, 2008 U.S. Dist. LEXIS 69825 (D. Mass. Sept. 17, 2008)................................................................................................................**15, 16, 17-18**

<u>United States v. Am. Trucking Ass'ns</u>, 310 U.S. 534 (1940)...................................................... **10**

**STATUTES & RULES:**

29 U.S.C. § 201, <u>et seq.</u> ................................................................................................................. **1**

29 U.S.C. § 207(a)(1) ................................................................................................................... **5**

29 U.S.C. § 213(b)(1) ............................................................................................... **1, 5, 11, 14, 20**

29 U.S.C. § 216(b)........................................................................................................................ **4**

49 U.S.C. § 13102(12) (pre-August 10, 2005)........................................................................ **6, 9**

49 U.S.C. § 13102(14) (pre- August 10, 2005)........................................................................... **6**

49 U.S.C. § 13102(14) (August 10, 2005 – June 6, 2008) ................................. **6, 12, 13, 14, 21**

49 U.S.C. § 13102(14) (post-June 6, 2008) ................................................................................ **7**

49 U.S.C. § 31132(1)(A) ......................................................................................................... **6, 12**

49 U.S.C. § 31502 ..............................................................................................................**passim**

49 U.S.C. § 31502(b)(1) ....................................................................................**5-6, 7, 11, 14**

Pub. L. No. 109-59, 119 Stat. 1144 ................................................................................ **6**

Pub. L. No. 110-244, 122 Stat. 1572 ............................................................................... **7**

Pub. L. No. 110-224, 122 Stat. 1572 at Sec. 121(a) ..................................................... **19**

Pub. L. No. 110-224, 122 Stat. 1572 at Sec. 305(c) ................................................. **7, 21**

Pub. L. No. 110-224, 122 Stat. 1572 at Sec. 306(a) ................................................. **8, 20**

Pub. L. No. 110-224, 122 Stat. 1572 at Sec. 306(b)................................................. **20-21**

Pub. L. No. 110-224, 122 Stat. 1572 at Sec. 306(c) ................................................. **8, 20**

H.R. Rep. No. 109-203 at Sec. 4142 ............................................................................... **6**

Fed. R. Civ. P. 23 ............................................................................................................... **4**

43 P.S. § 333.101, et seq. ................................................................................................... **1**

43 P.S. § 333.105(b)(7)...............................................................................................**1, 6, 8, 24**

## I.      INTRODUCTION

Defendants Rydbom Express, Inc. and Douglas H. Rydbom (collectively referred to as "Rydbom") submit this Memorandum in support of their Motion requesting that this Court grant Summary Judgment in Rydbom's favor with respect to Plaintiff Kyle Mayan's ("Mayan") claims for overtime under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), and the Pennsylvania Minimum Wage Act, 43 P.S. § 333.101, et seq. ("PMWA").

In his Class/Collective Action Complaint ("Complaint"), Mayan, on behalf of himself and all others similarly situated, asserts that Rydbom employees regularly work(ed) more than forty hours per week and, thus, are entitled to overtime payments pursuant to the FLSA and/or the PMWA.  In addition to Mayan, fifty-six current and former Rydbom employees have "opted-in" to this collective action asserting a similar right to overtime wages.[1]

Rydbom is entitled to Summary Judgment on all claims because, at all relevant times, Mayan and the opt-in Plaintiffs were exempt from overtime under the FLSA and the PMWA by virtue of the exemption for employees of motor carriers contained in 29 U.S.C. § 213(b)(1) (hereinafter the "Motor Carrier Act Exemption") and 43 P.S. § 333.105(b)(7).

## II.     STATEMENT OF UNDISPUTED FACTS

Rydbom Express, Inc. ("Rydbom") operates as a contract carrier for DHL International, Ltd.  (Defs.' Statement of Undisputed Facts ¶ 1, hereinafter referred to as "SUF.")  Rydbom operates out of a distribution terminal in Middletown, Pennsylvania.  (SUF ¶ 2.)  Prior to November 28, 2007, Rydbom also operated out of a distribution terminal in Reading, Pennsylvania.  (Id. ¶ 3.)  Prior to April 2006, Rydbom also operated out of a distribution terminal in Lancaster, Pennsylvania.  (Id. ¶ 4.)

---

[1] Pursuant to Court Order (Doc. 68), the PWMA claim is applicable only to Mayan and the fifty-six opt-in Plaintiffs, not to a broader class of unidentified employees (i.e. the PMWA claim is not being pursued as an "opt-out" class action).

Rydbom provides package delivery services for compensation to businesses and residences located in Pennsylvania.[2]   (Id. ¶ 5.)   The vast majority of packages delivered by Rydbom in Pennsylvania originate outside the Commonwealth.   (Id. ¶ 6.)

Rydbom operates a fleet of approximately 100 motor vehicles.   (Id. ¶ 7.)   Approximately 33% of these motor vehicles have a gross vehicle weight rating of at least 10,001 pounds.   (Id. ¶ 8.)   The motor vehicles having a gross vehicle weight rating of at least 10,001 pounds are indispensable to Rydbom's business.   (Id. ¶ 9.)

Plaintiff Kyle Mayan ("Mayan") was employed by Rydbom as a delivery driver from May 10, 2006 to November 3, 2007.   (Id. ¶ 10.)   Mayan worked out of Rydbom's Reading distribution center.   (Id. ¶ 11.)   The fifty-six opt-in Plaintiffs were/are employed by Rydbom as delivery drivers at either the Reading or Middletown distribution centers.   (Id. ¶ 12.)   Only eight opt-in Plaintiffs were employed by Rydbom on or after June 6, 2008: Daniel Bunnell, David Chacon, Richard Dobbs, Timothy Griffie, Gary Hoover, Stephen James, James Koons, and Freddy Martinez.   (Id. ¶ 13.)

The packages delivered by Rydbom's delivery drivers (including Mayan and the opt-in Plaintiffs) varied from day to day.   (Id. ¶ 14.)   Rydbom has no control over the size, shape, weight, or other characteristics of the packages to be delivered.   (Id. ¶ 15.)   Larger deliveries require the use of those motor vehicles having a gross vehicle weight rating of at least 10,001 pounds.   (Id. ¶ 16.)   To that end, upon commencement of employment with Rydbom, all delivery drivers (including Mayan and the opt-in Plaintiffs) undergo "behind the wheel" training, which enables them to drive any Rydbom vehicle, including those motor vehicles having a gross vehicle weight rating of at least 10,001 pounds.   (Id. ¶ 17.)

---

[2] Rydbom also conducts business as a DHL contract carrier in North Carolina.  And, until June 28, 2008, operated as a DHL contract carrier in Maine.

Because the motor vehicle each delivery driver operates can vary on a daily basis (depending on the nature of the packages to be delivered), Rydbom does not track or otherwise keep a record of which motor vehicle is operated by any particular delivery driver.  (Id. ¶ 18.) Rydbom's fuel records do, however, provide limited documented evidence of some of its delivery drivers' use of motor vehicles weighing at least 10,001 pounds.  The fuel records show which employee fueled a particular vehicle on a given date, which in turn, provides a clear indication of what vehicle an employee drove on a given day.  An employee can, however, drive a particular motor vehicle without having the need to fuel it—in that case, as explained in the previous paragraph, there is no record of what vehicle an employee drove.  (Id. ¶ 19.)

Based on these fuel records, three of the eight opt-in Plaintiffs employed on or after June 6, 2008 operated motor vehicles having a gross vehicle weight rating of at least 10,001 pounds at various times after June 6, 2008: Daniel Bunnell, Gary Hoover, and Freddy Martinez.  (Id. ¶ 20.) In addition, three of the eight opt-in Plaintiffs employed on or after June 6, 2008 admit to operating motor vehicles weighing at least 10,001 pounds: David Chacon, Richard Dobbs, and Freddy Martinez.  (Id. ¶ 21.)

Rydbom is registered with the U.S. Department of Transportation ("USDOT") and the Federal Motor Carrier Safety Administration ("FMCSA") as a motor carrier of property for compensation engaged in interstate commerce.  (Id. ¶ 22.)  At all times relevant to the instant litigation, Rydbom has been subject to the regulatory authority of the USDOT and the FMCSA. (Id. ¶ 23.)  Rydbom operates as a motor carrier under USDOT No. 832531 and FMCSA Docket No. MC-579383.  (Id. ¶ 24.)

Rydbom was unaware of the statutory revision to the definition of "motor carrier" implemented by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy

for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144, until it was served with Plaintiff's Class/Collective Action Complaint on or about July 16, 2007.  (Id. ¶ 25.)

## III.   PROCEDURAL HISTORY

In his Complaint, filed on or about June 26, 2007, Mayan asserts that Rydbom employees regularly work(ed) more than forty hours per week and, thus, are entitled to overtime payments pursuant to the FLSA and/or the PMWA.  (Doc. 1.)  On or about December 12, 2007, Mayan's claim was conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b) as follows: "all individuals who were employed by defendants in Pennsylvania during any time since August 10, 2005, and drove vehicles weighing less than 10,001 pounds."  (Doc. 37.)  In addition to Mayan, fifty-six current and former Rydbom employees have "opted-in" to this collective action asserting a similar right to overtime wages.  On or about May 12, 2008, by mutual stipulation of the parties and by Court Order, Mayan withdrew his request for class certification of his PMWA claim pursuant to Fed. R. Civ. P. 23 (i.e. an "opt-out" class action).  (Doc. 68.)  Mayan and the fifty-six opt-in Plaintiffs continue to assert claims for overtime compensation under both the FLSA and the PMWA.  Discovery closed on October 13, 2008.

## IV.   STATEMENT OF QUESTIONS PRESENTED

**A.      Whether the Claims for Overtime Wages prior to August 10, 2005 Should Be Dismissed Because, During that Period of Time, Mayan and the Opt-In Plaintiffs Were Subject to the Motor Carrier Act Exemption under Federal and State Law.**

**Suggested Answer:  Yes.**

**B.      Whether the Claims for Overtime Wages on or after August 10, 2005, but before June 6, 2008, Should Be Dismissed Because, During that Time, Mayan and the Opt-In Plaintiffs Were Subject to the Motor Carrier Act Exemption under Federal and State Law.**

**Suggested Answer:  Yes.**

C.   **Whether the Claims for Overtime Wages on and after June 6, 2008 Should Be Dismissed under Federal Law because the Opt-In Plaintiffs Employed by Rydbom During this Period of Time Were/Are Subject to the Motor Carrier Act Exemption and Were/Are Not "Covered Employees," as that Term is Defined by the Technical Corrections Act of 2008.**

**Suggested Answer:  Yes.**

D.   **Whether the Claims for Overtime Wages on or after June 6, 2008 Should be Dismissed under State Law because the Opt-In Plaintiffs Employed by Rydbom During this Period of Time Were/Are Subject to the Motor Carrier Act Exemption.**

**Suggested Answer:  Yes.**

## V.   ARGUMENT

### A.   Overview: The Motor Carrier Act Exemption

The FLSA generally requires that overtime be paid to employees for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  There are, however, certain exceptions to the general rule.  One such exception is the so-called Motor Carrier Act Exemption, which provides: "The provisions of section 207 of this title shall not apply with respect to … any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 … ."  Id. § 213(b)(1).[3]  To that end, pursuant to 49 U.S.C. § 31502, the Secretary of Transportation is authorized to establish qualifications and maximum hours of service for

---

[3] The Supreme Court has made clear that it is the existence of the Secretary of Transportation's power to establish qualifications and hours of service, not the actual exercise of that power, that matters for application of the Motor Carrier Act Exemption.  See Morris v. McComb, 332 U.S. 422, 434 (1947); Levinson v. Spector Motor Serv., 330 U.S. 649, 678 (1947); accord Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 253 (3d Cir. 2005).  Likewise, it is the Secretary of Transportation's interpretation of his or her power under 49 U.S.C. § 31502—*not any interpretation by the Secretary of Labor*—that is authoritative as to the scope of the Motor Carrier Act Exemption.  See Levinson, 330 U.S. at 676-77, 681, 684; Friedrich v. U.S. Computer Servs., 974 F.2d 409, 411 n.3 (3d Cir. 1992); Packard, 418 F.3d at 251 n.5.

"employees of … a motor carrier.  49 U.S.C. § 31502(b)(1).  **Thus, "employees" of a "motor carrier" are exempt from the overtime provisions of the FLSA.**[4]

Prior to August 10, 2005, a "motor carrier" was defined simply as: "a person providing *motor vehicle* transportation for compensation."  49 U.S.C. § 13102(12) (pre-August 10, 2005) (emphasis added).  The term "motor vehicle" was defined to include a:

> vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Secretary [of Transportation], but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from a fixed overhead wire, and providing local passenger transportation similar to street-railway service.

Id. § 13102(14) (pre- August 10, 2005).

On August 10, 2005, Congress enacted into law the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), which altered the definition of the term "motor carrier."[5]  Pub. L. No. 109-59, 119 Stat. 1144.  Under the revised definition, a "motor carrier" was "a person providing *commercial motor vehicle* (as defined in section 31132(1) of this title) transportation for compensation."  49 U.S.C. § 13102(14) (emphasis added).  The term "commercial motor vehicle" is defined, inter alia, as: "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle … has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater … ."  Id. § 31132(1)(A).

---

[4] The PMWA exempts from its overtime requirements "[a]ny employe of a motor carrier with respect to whom the Federal Secretary of Transportation has power to establish qualifications and maximum hours of service under 49 U.S.C. § 3102(b)(1) and (2) (relating to requirements for qualifications, hours of service, safety and equipment standards."  43 P.S. § 333.105(b)(7).  Thus, the PMWA, like the FLSA, recognizes the Motor Carrier Act Exemption.

[5] According to the relevant legislative history, the purpose for this change was not to narrow the Motor Carrier Act Exemption.  Rather, the purpose of SAFETEA-LU was to "harmonize[] the jurisdictional reach of the commercial and safety statutes by eliminating the requirement for motor carriers to register if they are not subject to the Federal motor carrier safety regulations."  H.R. Rep. No. 109-203 at Sec. 4142 (2005).  In fact, SAFETEA-LU's impact on the Motor Carrier Act Exemption was, by all accounts, an unintended consequence.

Thus, prior to the enactment of SAFETEA-LU (<u>i.e.</u> prior to August 10, 2005), a "motor carrier" included any business or entity that transported property in interstate commerce for compensation by vehicle, regardless of vehicle weight.  SAFETEA-LU substantially narrowed this definition.  After the enactment of SAFETEA-LU, a "motor carrier" included only those entities that transported property in interstate commerce for compensation using vehicles with a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds (<u>i.e.</u> over five tons).  Nevertheless, despite this distinction, **both prior to and after the enactment of SAFETEA-LU, an "employee" of a "motor carrier" was exempt from the FLSA's overtime provisions.**  <u>See</u> 49 U.S.C. § 31502(b)(1).  The only difference between the pre- and post-SAFETEA-LU exemption was the actual identity of the "motor carriers" (<u>i.e.</u> those using vehicles weighing more than five tons, as opposed to those using any type of self-propelled vehicle).  **SAFETEA-LU did not change or alter the term "employees" under 49 U.S.C. § 31502 in any way.**

Congress, however, was not done yet.  On June 6, 2008, the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, 122 Stat. 1572 ("Technical Corrections Act"), was enacted into law.  Section 305(c) of the Technical Corrections Act states, in relevant part:

> DEFINITIONS RELATING TO MOTOR CARRIERS.—Paragraphs (6)(B), (7)(B), (14), and (15) of section 13102 of such title are each amended by striking "commercial motor vehicle (as defined in section 31132)" and inserting "motor vehicle".

<u>Id.</u> § 305(c).  In short, the Technical Corrections Act restored the definition of "motor carrier" to its pre-SAFETEA-LU state.  Once again, a "motor carrier" is now defined as "a person providing *motor vehicle* transportation  for compensation."  49 U.S.C. § 13102(14) (emphasis added).

While it restored the "motor carrier" definition to its pre-August 10, 2005 state, Congress also used the Technical Corrections Act to create a new category of overtime recipients, referred to as "covered employees."  These employees are discussed in Section 306 of the Technical

Corrections Act, titled "Applicability of Fair Labor Standards Act Requirements and Limitation on Liability," as follows:

> APPLICABILITY FOLLOWING THIS ACT.—Beginning on the date of enactment of this Act [i.e. June 6, 2008], section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) shall apply to a *covered employee* notwithstanding section 13(b)(1) of that Act (29 U.S.C. 213(b)(1)).

Id. § 306(a) (emphasis added).  The Technical Correction Act defines "covered employees" as follows:

> COVERED EMPLOYEES DEFINED.—In this section, the term "covered employee" means an individual—
>
> (1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
>
> (2) whose work, in whole or in part, is defined—
>
> > (A) as that of a driver, driver's helper, loader, or mechanic; and
> >
> > (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce …; and
>
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Id. § 306(c).  Thus, starting on June 6, 2008, notwithstanding the presence of the Motor Carrier Act Exemption, an individual may be entitled to overtime wages if he or she can establish his or her status as a "covered employee."[6]

What was once a relatively simple matter—"employees" of "motor carriers" are exempt from the overtime requirements of the FLSA—has mutated into a tangled web of piecemeal legislative amendments, retractions, and revisions, leaving courts and employers alike scratching

---

[6] To be sure, the creation of "covered employees" is exclusive to federal law.  The PMWA does not adopt or endorse this newly created category of non-exempt employees.  See 43 P.S. § 333.105(b)(7).

their heads when attempting to figure out exactly to whom the Motor Carrier Act Exemption applies, and, perhaps more importantly, when such exemption should be deemed applicable.

At its core, however, the basic concept remains the same.  As previously discussed, the Motor Carrier Act Exemption circumvents the FLSA's overtime provisions when two requirements are established: (1) the employer is a "motor carrier," and (2) the individual in question is an "employee" of that motor carrier, as those terms are used in 49 U.S.C. § 31502. Thus, resolution of this matter turns on a review of the Motor Carrier Act Exemption, and specifically, the meaning of "motor carrier," at three separate periods of time: (1) prior to August 10, 2005 (before the enactment of SAFETEA-LU); (2) after August 10, 2005, but before June 6, 2008 (after the enactment of SAFETEA-LU, but before the enactment of the Technical Corrections Act); and (3) after June 6, 2008 (after the enactment of the Technical Corrections Act).

**B.      The Motor Carrier Act Exemption prior to August 10, 2005**

The parties do not dispute the fact that the Motor Carrier Act Exemption applied to Mayan and all opt-in Plaintiffs prior to the enactment of SAFETEA-LU.  (See Doc. 34 [Mayan and opt-in Plaintiffs concur in limiting the scope of the relevant class to those individuals employed by Rydbom on or after August 10, 2005].)  As such, Mayan and the opt-in Plaintiffs are not entitled to overtime compensation at any point prior to August 10, 2005.

**1.      Rydbom was a "motor carrier" pursuant to 49 U.S.C. § 31502 prior to the enactment of SAFETEA-LU.**

Before SAFETEA-LU, a "motor carrier" was defined as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(12) (pre-August 10, 2005).  The primary aspect of Rydbom's business is providing motor vehicle transportation (delivering packages traveling through interstate commerce using trucks and vans) for compensation.  (SUF

¶¶ 5-6.)  Thus, Rydbom clearly qualified as a "motor carrier" under § 31502 prior to August 10, 2005.

### 2.    Mayan and the opt-in Plaintiffs were "employees" pursuant to 49 U.S.C. § 31502 prior to the enactment of SAFETEA-LU.

For purposes of 49 U.S.C. § 31502, the term "employees" refers to "those employees whose activities affect the safety of operation" of motor vehicles in interstate commerce.[7] United States v. Am. Trucking Ass'ns, 310 U.S. 534, 553 (1940) (defining "employees" under statutory provisions that would later become 49 U.S.C. § 31502).  The category of employees that have been held to "affect the safety of operation" are drivers, driver's helpers, loaders, and mechanics.  See Levinson v. Spector Motor Serv., 330 U.S. 649, 673 (1947) (accepting Interstate Commerce Commission's finding that "full-duty drivers, mechanics, loaders and helpers … affect safety of operation of the carriers by whom they are employed"); see also id. at 685 (loaders); Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48-49 (1943) (drivers); Morris v. McComb, 332 U.S. 422, 434 (1947) (mechanics).

By their own admissions, Mayan and the opt-in Plaintiffs are covered by this definition. In the Complaint, Mayan classifies himself and the other opt-in Plaintiffs as "Delivery Workers" who "deliver packages to residences and businesses within Pennsylvania and, in performing such duties, regularly and consistently *drive* company-owned vehicles … ."  (Compl. ¶ 10 [emphasis added].)   As noted above, drivers are one of the categories of employees that have been recognized as "affect[ing] the safety of operation" of a motor carrier.  See Am. Trucking Ass'ns, 310 U.S. at 533; Levinson, 330 U.S. at 673, 685; Bayley, 319 U.S. at 48-49; Morris, 332 U.S. at 434.  Moreover, Plaintiffs' driving, even if wholly intrastate, affected interstate commerce

---

[7] Purely intrastate driving has been held to "affect the safety of operation" so long as at least some of the property being transported is moving in interstate commerce.  See, e.g., Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 224 (2d Cir. 2002) (driver's intrastate carriage of bottles destined for shipment to other states constituted interstate commerce because driver's activity was "part of a continuous movement of goods in interstate commerce").

because the vast majority of packages delivered originated from sources outside Pennsylvania. (SUF ¶ 6.)  Indeed, Mayan and the opt-in Plaintiffs concede that their work had a direct impact on interstate commerce.  (See Compl. ¶ 8 ["Defendants employ workers, including Plaintiff, engaged in handling, receiving, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce."].)

Thus, according to their own allegations, Mayan and the opt-in Plaintiffs were/are "employees" of Rydbom, a "motor carrier," within the meaning of 49 U.S.C. § 31502.  As such, the Secretary of Transportation had the power to regulate their qualifications and hours of service.  Id. § 31502(b)(1).  Because the FLSA's overtime provisions do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49," 29 U.S.C. § 213(b)(1), it is wholly undisputed that Mayan and the opt-in Plaintiffs were exempt from overtime compensation under the FLSA prior to the enactment of SAFETEA-LU, i.e. prior to August 10, 2005.

### C.    The Motion Carrier Act Exemption on and after August 10, 2005, but before June 6, 2008

The main question presented to this Court on summary judgment, and the bulk of the overtime wage claims asserted by Mayan and the opt-in Plaintiffs, hinge on whether SAFETEA-LU removed Mayan and the opt-in Plaintiffs from the scope of the Motor Carrier Act Exemption. Because Mayan and the opt-in Plaintiffs remained "employees" of a "motor carrier" even after the passage of SAFETEA-LU, Rydbom is also entitled to summary judgment on all overtime claims between August 10, 2005 and June 6, 2008.

1.    **Rydbom remained a "motor carrier" pursuant to 49 U.S.C. § 31502 after the enactment of SAFETEA-LU.**

The only change made by SAFETEA-LU relevant to this case is the alteration of "motor carrier" under 49 U.S.C. § 13102(14).  As previously noted, SAFETEA-LU changed the definition of "motor carrier" by simply adding the word "commercial" before "motor vehicle." Section 31132(1), in turn, defines "commercial motor vehicle" as "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle … [has] a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater … ."  Id. § 31132(1)(A).  Together, these definitions yield a precise meaning of the term "motor carrier" as modified by SAFETEA-LU: a carrier that transports property in interstate commerce for compensation by vehicle with a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds.

Because this change in definition caused a great deal of confusion (and eventually led to a repeal at the hands of the Technical Corrections Act on June 6, 2008), it is worth noting a few things about SAFETEA-LU's effect on the Motor Carrier Act Exemption.  First, it is important to recognize that SAFETEA-LU's revised definition of "motor carrier" narrowed, to some extent, the Secretary of Transportation's authority under 49 U.S.C. § 31502.  Before SAFETEA-LU, the Secretary of Transportation had the power to set qualifications and hours of service for employees of anyone providing transportation for compensation by motor vehicle, **including** companies or persons that did not operate any *commercial* motor vehicles (i.e. those companies that did not have vehicles weighing more than five tons).  After the enactment of SAFETEA-LU, and until June 6, 2008, the Secretary of Transportation was stripped of the authority to regulate employees of companies or persons that operated no commercial motor vehicles.

Second, it is equally important to understand what this definition of "motor carrier" did not do. SAFETEA-LU's revised definition of "motor carrier" did not require a company to operate **only** "commercial motor vehicles" to qualify as a motor carrier. 49 U.S.C. § 13102(14). It simply required that the company "provid[e] commercial motor vehicle transportation for compensation." Id. Thus, notwithstanding SAFETEA-LU's revision, a company that provided at least some transportation for compensation using commercial motor vehicles remained a "motor carrier" within the meaning of § 31502, even if the company also provided some transportation for compensation using non-commercial motor vehicles. Likewise, the revised definition of "motor carrier" did not cause a company's status as a motor carrier to vary depending on the weight of the vehicle driven by a particular employee. Rather, under the revised definition, a company's status as a "motor carrier" depended only on whether the company provided commercial motor vehicle transportation for compensation. If the company provided such transportation, it was a motor carrier; if it did not provide such transportation, it was not a motor carrier. **Nothing in the revised definition supports the idea that the same company could be a "motor carrier" within the meaning of 49 U.C.S. § 31502 as to one employee, but not a "motor carrier" within the meaning of the same statute with respect to a different employee.**

Application of the foregoing principles to the case at bar shows that Rydbom undeniably satisfies SAFETEA-LU's revised definition of "motor carrier." Rydbom transports property in interstate commerce for compensation using a large fleet of vehicles of various weights and sizes, and approximately 33% of these vehicles have a gross vehicle weight rating of at least 10,001 pounds. (SUF ¶¶ 7-8.) Because it is undisputed that Rydbom "provid[es] transportation for compensation by commercial motor vehicle," it is, without question, a motor carrier within

the meaning of 49 U.S.C. § 31502.  Indeed, Rydbom is registered and recognized as a motor carrier by the Department of Transportation, and it has both a USDOT number and a FMCSA number.  (SUF ¶¶ 22-24.)  Accordingly, the Secretary of Transportation has the power to establish "qualifications and maximum hours of service" for Rydbom's employees, 49 U.S.C. § 31502(b)(1), including drivers of vehicles of all sizes (i.e. Mayan and all opt-in Plaintiffs), and those employees who are subject to the Secretary of Transportation's authority are exempt from the FLSA's overtime provisions.  29 U.S.C. § 213(b)(1).

### 2. Mayan and the opt-in Plaintiffs remained "employees" pursuant to 49 U.S.C. § 31502 after the enactment of SAFETEA-LU.

As previously mentioned, SAFETEA-LU did not affect the term "employees" as it is used in 49 U.S.C. § 31502 in any way.[8]  Thus, the post-SAFETEA-LU analysis of the term "employees" is identical to the pre-SAFETEA-LU analysis: according to their own allegations, from August 10, 2005 to June 6, 2008, Mayan and the opt-in Plaintiffs were "employees" of Rydbom, a "motor carrier," within the meaning of 49 U.S.C. § 31502.  As such, the Secretary of Transportation had the power to regulate their qualifications and hours of service.  Id. § 31502(b)(1).  Because the FLSA's overtime provisions do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49," 29 U.S.C. § 213(b)(1), Mayan and the opt-in Plaintiffs were exempt from overtime compensation under the

---

[8] SAFETEA-LU made no change whatsoever to the text of 49 U.S.C. § 31502(b)(1).  SAFETEA-LU changed only the definitions of "motor carrier" and "motor private carrier" in 49 U.S.C. § 13102 by simply adding the word "commercial" before the term "motor vehicle."  Nothing in that limited change suggests, either expressly or impliedly, an intent to change the term "employees" in § 31502(b)(1).  In fact, because Congress chose to amend the language of 49 U.S.C. § 13102, but left 49 U.S.C. § 31502(b)(1) intact, it must be presumed that Congress intended to preserve the long-established meaning of the term "employees" in § 31502(b)(1), i.e. those employees whose activities affect the safety of operation of *motor vehicles*—not commercial motor vehicles—in interstate commerce.  See In re Air Crash Disaster Near Peggy's Cove, 210 F. Supp. 2d 570, 575 (E.D. Pa. 2002) ("[W]hen Congress amends an existing statute, a court must presume that any part of the statute left intact reflects Congress's intent to preserve the prevailing judicial interpretation of that portion.").

FLSA between the time of the enactment of SAFETEA-LU and the enactment of the Technical

Corrections Act, i.e. after August 10, 2005, but before June 6, 2008.

### 3.    Case law supports Rydbom's argument.

To be sure, the only case dealing directly with this very issue (i.e. whether a company

that uses both motor vehicles and commercial motor vehicles to transport property in interstate

commerce for compensation is a "motor carrier" for purposes of 49 U.S.C. § 31502) was decided

in favor of the employer.  In Tidd v. Adecco USA, Inc., No. 07-11214, 2008 U.S. Dist. LEXIS

69825 (D. Mass. Sept. 17, 2008), the U.S. District Court for the District of Massachusetts

granted FedEx Ground Package System, Inc.'s motion for summary judgment and dismissed the

plaintiffs' claims for overtime compensation under the FLSA and applicable state law.  Similar

to the case at bar, the plaintiffs in Tidd worked as delivery drivers.  Tidd, 2008 U.S. Dist. LEXIS

69825 at *2.  Moreover, like Rydbom, FedEx operated vehicles of varying sizes and weights to

transport property in interstate commerce for compensation.  Id. at *8.  And like Rydbom, some

FedEx employees drove vehicles weighing less than 10,001 pounds (i.e. non-commercial motor

vehicles), some drove vehicles weighing more than 10,000 pounds (i.e. commercial motor

vehicles), and some drove both.  Id. at *11.  FedEx moved for summary judgment on the grounds

that, even after the enactment of SAFETEA-LU, it remained a "motor carrier," and its drivers

remained "employees."  Accordingly, FedEx argued that the plaintiffs (regardless of the type of

motor vehicle they drove) were exempt from the overtime provisions of the FLSA.

In response, the plaintiffs argued that FedEx should be treated as a "motor carrier" only

to the extent that it operated motor vehicles weighing more than five tons, and that FedEx should

not be treated as a "motor carrier" to the extent it operated motor vehicles weighing five tons or

less.  Id. at *8.

In deciding FedEx's summary judgment motion, the court first looked to the practicalities of the situation by grouping companies like FedEx (and Rydbom, i.e. trucking and/or delivery companies) into three separate categories:

> With respect to the 10,001 pound dividing line, a trucking company would fall within one of three categories. It might operate only trucks weighing more than five tons, in which case it would clearly be a "motor carrier" subject to regulation by the Secretary of Transportation with respect to employee hours. Or it might operate only trucks weighing five tons or less, in which case it would just as clearly not be a "motor carrier." **In the third case, it might operate a fleet that includes trucks both bigger and smaller than five tons.** FedEx is in this category. The plaintiffs propose that the statutes be interpreted to give the Secretary of Transportation the power to regulate hours of FedEx employees whose work affects the safety of operation of the larger trucks, but to deny the Secretary that power as to those FedEx employees whose work affects the smaller trucks. As to the latter class of employees, the Motor Carrier Act Exemption would not apply, and relief under the FLSA would be available.

Id. at *8-9 (emphasis added).

The court found the plaintiffs' argument to be untenable because companies like FedEx (and Rydbom) cannot be treated as "motor carriers" under some circumstances, but not others. FedEx's fleet of vehicles included commercial motor vehicles and, thus, FedEx was a "motor carrier" under the SAFETEA-LU revised definition of the term. Moreover, the plaintiffs in Tidd were found to be "employees" under 49 U.S.C. § 31502 regardless of the weight of the motor vehicles they drove. Accordingly, the court granted FedEx's motion for summary judgment and dismissed the plaintiffs' claim for overtime wages.[9]

Because the facts and arguments of Tidd are virtually indistinguishable from the instant matter, the Tidd court's reasoning and analysis should be afforded great weight. Indeed, this is the only reported decision that deals with the very narrow issue of whether a trucking/delivery

---

[9] Notably, none of the plaintiffs were working for FedEx on or after June 6, 2008, i.e. the date of the enactment of the Technical Corrections Act. Thus, the court was focused exclusively on the post-SAFETEA-LU/pre-Technical Corrections Act definition of the term "motor carrier." The Technical Corrections Act's impact on Plaintiffs' claims in the case at bar (if any) will be addressed infra, Section D.

company with a mixed fleet of motor vehicles can be considered a "motor carrier" under the revised definition implemented by SAFETEA-LU.  For this reason, the relevant aspects of the court's opinion are cited at length below:

> The question thus devolves to whether FedEx is either a "motor carrier" or not, or whether it can be both a "motor carrier" and not one at the same time with respect to different employees.
>
> In theory, it is possible that a company like FedEx could be deemed a "motor carrier" to the extent it operated bigger trucks and not a "motor carrier" to the extent it operated smaller trucks, so that the Secretary of Transportation would have the authority to regulate hours of service for some drivers and the Secretary of Labor would have similar authority for other drivers.  Without some specific indication that Congress intended such a bifurcation of regulatory responsibilities -- that is, an affirmative indication beyond the simple fact of the statute's ambiguity -- the theory does not recommend itself.  As a practical matter, dividing between agencies the responsibility for regulating maximum hours for similar employees of a given employer, while not impossible to conceive, as a practical matter would no doubt lead to a proliferation and complication of rules and enforcement.  As FedEx points out, its drivers may not be easily placed in one category or the other.  For example, drivers might drive both categories of trucks at different times.  For such drivers, bifurcating the regulatory responsibilities would mean that some of the time their maximum hours would be regulated by the Secretary of Transportation and some of the time they would be regulated by the Secretary of Labor.  How one might compute the maximum hours in a workweek regulated by different standards is an interesting question.
>
> A more sensible approach is the "either-or" interpretation.  This approach would deem an employer to be a "motor carrier" if it meets the definition of sections 13102(14) and 31132(1) of Title 49 because it uses 10,001 pound-plus trucks in interstate commerce, even if it also conducts other operations that do not meet that definition.  In that case, the Motor Carrier Act Exemption would apply, and the Secretary of Transportation would be empowered, exclusively, to prescribe the maximum hours of service for the company's drivers.
>
> The plaintiffs' interpretation would effectively rewrite section 31502 of Title 49 to make an individual employee's daily work the determining factor as to the Secretary of Transportation's regulatory authority, rather than the specified characteristic of the employer.  As noted above, the FLSA does hinge the applicability of some exemptions on what the employee does.  It hinges others on what the employer does.  The Motor Carrier Exemption is more like the second method than the first, even after the SAFETEA-LU amendment.

- 17 -

> In sum, FedEx uses "commercial motor vehicles" to transport property in interstate commerce, 49 U.S.C.§ 31132(1), and is therefore a "motor carrier," 49 U.S.C. § 13102(14), as to whose employees the Secretary of Transportation has the power to prescribe requirements for maximum hours of service, 49 U.S.C. § 31502(1).  Accordingly, the Motor Carrier Act Exemption applies, 29 U.S.C. § 213(b)(1), and the plaintiffs' claims under the FLSA are foreclosed.  The motion for partial summary judgment is therefore GRANTED.

Id. at *10-12.  The Tidd court's reasoning is logical and sound, and this Court should adopt its analysis and dismiss Plaintiffs' claims for overtime wages allegedly due and owing between August 10, 2005 and June 6, 2008 (i.e. the time period during which the SAFETEA-LU revisions were in effect).

### 4.    Policy and common sense support Rydbom's argument.

A decision contrary to Tidd (i.e. a finding that a company could be considered a "motor carrier" in some circumstances, but not others) would certainly run afoul of basic notions of policy and common sense.  Specifically, such an interpretation of SAFETEA-LU's revisions would necessarily mean that the Secretary of Transportation's authority to regulate qualifications and hours of service for a driver employed by a motor carrier operating a fleet with both commercial and non-commercial motor vehicles—and, thus, whether that driver is exempt from the FLSA's overtime requirements—could have varied from week to week, day to day, or even hour to hour, depending on which motor vehicle the driver was operating at the time.

Such an interpretation would be even more absurd with regard to loaders and mechanics (over whom the Secretary of Transportation's authority to regulate qualifications and hours of service also extends), who could reasonably be expected to work on vehicles weighing both more and less than 10,000 pounds—perhaps even simultaneously—every day.  For example, if the Motor Carrier Act Exemption were based on the weight of the particular vehicle affected by a particular employee, a loader or mechanic would be exempt while loading or servicing a

commercial motor vehicle on his or her left but non-exempt while loading or servicing a motor vehicle on his or her right.  Obviously, such a result would render it practically impossible for motor carriers who use a mixed fleet of motor vehicles (like Rydbom) to accurately track their employees' exempt or non-exempt status.[10]

The Motor Carrier Act Exemption should not be construed to lead to such burdensome and illogical results.  Rather, it should be interpreted according to its plain meaning: it applies to all drivers (and helpers, loaders, and mechanics) of a motor carrier that provides commercial motor vehicle transportation, regardless of the weight of the vehicle that the driver operates (or the helper, loader, or mechanic works on).  Applying this logical and straightforward application to the undisputed facts of this case leads to the inescapable conclusion that all overtime claims from August 10, 2005 to June 6, 2008 should be dismissed.

**D.     The Motor Carrier Act Exemption after June 6, 2008**[11]

As noted previously, the Technical Corrections Act reverted the definition of "motor carrier" to its pre-SAFETEA-LU state (and thus, reinstated the Secretary of Transportation's power to regulate the hours of service of employees of all motor carriers—not simply those using commercial motor vehicles).  This took effect on June 6, 2008; it was not applied retroactively to the date of the enactment of SAFETEA-LU.  See Section 121(a) of Pub. L. No. 110-244, 122 Stat. 1572 ("[T]his Act and the amendments made by this Act take effect on the date of enactment of this Act.").  As a result, SAFETEA-LU's revised definition of "motor carrier," discussed supra, Section C, remained in effect from August 10, 2005 until June 6, 2008.

---

[10] Of course, this is not a situation where Rydbom has attempted to circumvent the FLSA's overtime requirements by using a single "token" commercial motor vehicle.  Rather, Rydbom's fleet contains over thirty commercial motor vehicles, without which Rydbom would not be able to stay in business.  (SUF ¶¶ 7-9.)

[11] Until June 6, 2008, the overtime analysis under the FLSA and the PMWA remained the same because both laws adhered to the Motor Carrier Act Exemption.  From June 6, 2008 onward, however, the only claim for overtime that may be asserted by Mayan or any opt-in Plaintiff is as a "covered employee"—a classification recognized under federal, not state, law.

However, while it restored the "motor carrier" definition to its pre-August 10, 2005 state, Section 306 of the Technical Corrections Act makes several noteworthy **prospective** changes relating to the Motor Carrier Act Exemption.  Most significantly, it expressly applies the FLSA's overtime requirements to employees of motor carriers (despite the Secretary of Transportation's fully restored authority) who "affect the safety of operation of motor vehicles weighting 10,000 pounds or less" and "perform[] duties on motor vehicles weighing 10,000 pounds or less," even though those employees would otherwise be exempt from overtime wages pursuant to 29 U.S.C. § 213(b)(1).  See Section 306(a), (c) of Pub. L. No. 110-244, 122 Stat. 1572.  Stated differently, Section 306 establishes, for the very first time, that "employees" of "motor carriers" may be eligible to receive overtime compensation.

Despite this newly adopted statutory provision, there are two reasons why Mayan and the opt-in Plaintiffs cannot be considered "covered employees" under Section 306 of the Technical Corrections Act.  First, Section 306 cannot be applied retroactively.  And second, the opt-in Plaintiffs who were employed by Rydbom as delivery drivers after June 6, 2008 are not "covered employees" as a matter of law.

### 1.    The "covered employee" provision of the Technical Corrections Act cannot be applied retroactively.

By its own terms, Section 306 of the Technical Corrections Act only applies on and after its effective date.  See Section 306(a) of Pub. L. No. 110-244, 122 Stat. 1572 (stating that the new law takes effect "[b]eginning on the date of enactment of this Act").  The Technical Corrections Act was enacted into law on June 6, 2008, so employees of motor carriers who drive light vehicles may be eligible for overtime only on and after that date—not before.[12]   Here,

---

[12] Moreover, this Court need not apply the Technical Corrections Act retroactively to give effect to the "Limitation on Liability" provision found in Section 306(b).  Under Section 306(b), an employer who lacked "actual knowledge that [it] was subject to the requirements of [29 U.S.C. § 207] with respect to [a] covered employee" is not liable for

between Mayan and the fifty-six opt-in Plaintiffs, only eight were employed by Rydbom on or after June 6, 2008: Daniel Bunnell, David Chacon, Richard Dobbs, Timothy Griffie, Gary Hoover, Stephen James, James Koons, and Freddy Martinez.  (SUF ¶ 13.)  Consequently, these eight Plaintiffs are the only employees who could possibly assert a claim for overtime pursuant to Section 306 of the Technical Corrections Act.

> **2.    The "covered employee" provision of the Technical Corrections Act does not apply to the eight opt-in Plaintiffs employed by Rydbom after June 6, 2008.**

To be a "covered employee" under Section 306 of the Technical Corrections Act, an individual must show that he or she: (1) is an employee of a motor carrier; (2) is a driver affecting the safety of operation of motor vehicles weighing 10,000 pounds or less; and (3) performs duties on motor vehicles weighing 10,000 pounds or less.  As to the first element, no one disputes that the eight opt-in Plaintiffs were employees of a motor carrier.  The parties part ways, however, on the meaning and effect of the second and third elements of the "covered employee" test.  Given the fact that this statute was enacted less than six months ago, there is scant authority upon which to rely in interpreting these provisions.  Nevertheless, Rydbom

---

failing to pay overtime to that covered employee  "in the 1-year period beginning on August 10, 2005."  Section 306(b)(1) of Pub. L. No. 110-244, 122 Stat. 1572.  The intended beneficiaries of this provision are employers that qualified as "motor carriers" before, but not after, SAFETEA-LU—that is, businesses that provide interstate transportation for compensation *but operate no commercial motor vehicles.*  Before SAFETEA-LU, such businesses were "motor carriers" whose drivers were exempt from the FLSA's overtime requirement pursuant to the Motor Carrier Act Exemption.  After SAFETEA-LU, however, these businesses no longer satisfied the definition of "motor carrier" in 49 U.S.C. § 13102.  Thus, they were no longer subject to the Secretary of Transportation's regulatory authority in 49 U.S.C. § 31502, and their drivers (all of whom necessarily drove motor vehicles weighing less than 10,001 pounds) were no longer exempt from the FLSA's overtime requirements.  The Technical Corrections Act not only restores the Secretary of Transportation's power to regulate such businesses as "motor carriers," see Section 305(c) of Pub. L. No. 110-244, 122 Stat. 1572, but also provides in Section 306(b)(1) that, as long as such businesses did not have "actual knowledge" that SAFETEA-LU's narrowing of the term "motor carrier" removed their drivers from the Motor Carrier Act Exemption, they are not liable for failing to pay their drivers overtime between August 10, 2005 and August 10, 2006.  Here, the "Limitation of Liability" provision is simply inapplicable to companies like Rydbom who were "motor carriers" both before and after SAFETEA-LU because the "employees" of such companies were never entitled to overtime compensation.  In any event, the undisputed evidence of record clearly shows that Rydbom (like Congress) was unaware of SAFETEA-LU's effect on the FLSA's overtime requirements.  (SUF ¶ 25.)

respectfully submits that the eight opt-in Plaintiffs employed by Rydbom on or about June 6, 2008 cannot be considered "covered employees" under Section 306 of the Technical Corrections Act.

The clear import of Section 306 is that, to qualify for FLSA-mandated overtime, a "covered employee" must work ("in whole or in part"[13]) **exclusively** on motor vehicles weighing 10,000 pounds or less (i.e. to the exclusion of motor vehicles weighing 10,001 pounds or more). To clarify this point, reference is made to the loader/mechanic example raised in the previous section: theoretically, a loader or mechanic could be a "covered employee" while loading or servicing a motor vehicle weighing 10,000 pounds or less on his or her left, but not a "covered employee" (and thus, exempt from the FLSA's overtime requirements) while loading or servicing a motor vehicle weighing more than 10,000 pounds on his right.  This cannot be the intention of Section 306, as such a result would render it practically impossible for motor carriers who use a mixed fleet of vehicles (like Rydbom) to accurately track their employees' exempt or non-exempt status.  Again, the three categories of motor carriers identified by the Tidd court are instructive: those companies operating only motor vehicles weighing more than five tons cannot employ any "covered employees," and, conversely, those companies operating exclusively motor vehicles weighing five tons or less clearly employ "covered employees."  Section 306 of the Technical Corrections Act is squarely aimed at this latter group.  Rydbom, however, cannot easily be placed in either category because, as previously explained, its business depends on a

---

[13] To make sense, the term "in part" must be read to mean the existence of work unrelated to motor vehicles.  For example, a "covered employee" may work "in part" by driving a vehicle weighing 10,000 pounds or less, and "in part" by installing satellite dishes.  See Kautsch v. Premier Commc'ns, 502 F. Supp. 2d 1007 (W.D. Mo. 2007) (The plaintiffs worked as technicians, installing and servicing a third party's satellite television systems.  The employer received equipment from the third party and paid to transport the equipment form its warehouse to its customers. No vehicle weighing in excess of 10,001 pounds was used to transport the equipment.).  It simply defies reason and logic to construe the definition of "covered employees" to include employees of a mixed fleet company (like Rydbom) who work "in part" on vehicles weighing 10,000 pounds or less, and "in part" on vehicles weighing more than 10,001 pounds—especially where, as here, there is no readily discernable method of tracking the time spent on any particular vehicle.

mixed fleet of motor vehicles, with some weighing more than 10,000 pounds and others weighing less.

Moreover, the particular type of vehicle Rydbom's employees use can, and often does, change on a daily basis depending on the packages, items, or products being delivered.  (SUF ¶ 14.)  Rydbom has no control over the size of these items, which, in turn, dictates the type of vehicle required to transport those items in interstate commerce.  (SUF ¶¶ 15-16.)  Consequently, many—if not all—of Rydbom's drivers operate motor vehicles weighing more than five tons, or, at the very least, may be called upon to do so at any time.  (SUF ¶ 17.)

To that end, the eight opt-in Plaintiffs employed by Rydbom after June 6, 2008 cannot be considered "covered employees" because Rydbom's operations (and, thus, its employees' duties) depend on the use and availability of motor vehicles weighing more than 10,000 pounds.  This is not theoretical.  While the very nature of Rydbom's business makes it difficult to track the vehicles used by each employee on a daily basis (SUF ¶ 18), the undisputed evidence of record reveals that at least five of the eight opt-in Plaintiffs drove vehicles weighing more than five tons after June 6, 2008:

> Rydbom's fuel records show that Daniel Bunnell, Gary Hoover, and Freddy Martinez fueled vehicles weighing more than 10,000 pounds at various times after June 6, 2008.  (SUF ¶¶ 19-20.)

> Pursuant to Requests for Admissions issued by Rydbom to Mayan and all opt-in Plaintiffs, David Chacon, Richard Dobbs, and Freddy Martinez admitted to driving and/or operating motor vehicles weighing more than 10,000 pounds. (SUF ¶ 21.)

And although there is no documentation currently available to show that Timothy Griffie, Stephen James, or James Koons drove motor vehicles weighing more than 10,000 pounds after June 6, 2008, such evidence is not necessary to preclude their claims for overtime wages.  Cf.

Morris v. McComb, 332 U.S. 422, 431 (1947) (An entire class of employees may be exempt even though the interstate driving attributed to certain employees was sporadic and occasional.).

In sum, any claim for overtime wages incurred on or after June 6, 2008 should be dismissed because the eight opt-in Plaintiffs employed by Rydbom during the relevant time frame cannot be considered "covered employees" by virtue of the fact that they were called upon to drive, and in many instances, did drive, motor vehicles weighing more than 10,000 pounds.[14]

### E.      The Motor Carrier Exemption as applied to the PMWA

As explained supra, note 4, the PMWA exempts from its overtime requirements "[a]ny employe of a motor carrier with respect to whom the Federal Secretary of Transportation has power to establish qualifications and maximum hours of service under 49 U.S.C. § 3102(b)(1) and (2) (relating to requirements for qualifications, hours of service, safety and equipment standards."  43 P.S. § 333.105(b)(7).  Thus, the PMWA, like the FLSA, recognizes the Motor Carrier Act Exemption (i.e. "employees" of a "motor carrier" are exempt from its overtime requirements).  As noted supra, note 11, however, the PMWA does not recognize "covered employees" (as that term is used and defined in the Technical Corrections Act).  Accordingly, the analysis contained in Sections B and C is incorporated herein by reference.  For the reasons previously addressed in those Sections, Mayan and the opt-in Plaintiffs are not entitled to

---

[14] However, should this Court determine that the opt-in Plaintiffs' claims for overtime wages incurred on or after June 6, 2008 should not be dismissed at this stage of review, Rydbom has filed a Motion for Class Decertification alongside the instant Motion for Summary Judgment.  Briefly, the basis of Rydbom's Motion for Decertification is as follows: The only colorable claim for overtime wages in this matter is as a "covered employee," as that term is defined by the Technical Corrections Act.  To that end, "covered employees" are entitled to overtime wages incurred on and after June 6, 2008.  Mayan, the named Plaintiff, was not employed by Rydbom on or after June 6, 2008 and, thus, is not similarly situated to the eight opt-in Plaintiffs who were, in fact, employed during that time.  Moreover, should this Court disagree with Rydbom's interpretation and application of "covered employee" under the Technical Corrections Act, any contrary interpretation would involve a detailed and fact-specific analysis of each employee's daily activities and duties (i.e. time spent each day working on motor vehicles weighing 10,000 pounds or less vis-à-vis motor vehicles weighing more than 10,000 pounds).  Thus, litigating this matter as a collective action would be anything but efficient.  Consequently, should this Court decide to deny Rydbom's Motion for Summary Judgment with respect to the claims for overtime wages incurred on or after June 6, 2008, Rydbom respectfully requests that this Court decertify the instant collective action and allow the eight opt-in Plaintiffs to bring individual actions in their own name.

overtime wages because, at all relevant times, they were "employees" of a "motor carrier." Therefore, Rydbom is entitled to summary judgment on all overtime claims brought pursuant to the PMWA.

## VI.    CONCLUSION

For all of the foregoing reasons, Defendants Rydbom Express, Inc. and Douglas H. Rydbom respectfully request that this Court grant their Motion for Summary Judgment and dismiss all claims for overtime wages asserted by Plaintiff Kyle Mayan and the fifty-six opt-in Plaintiffs.

Respectfully submitted,

By:    */s/ Todd J. Shill*
Todd J. Shill, Esq. (ID No. 69225)
John R. Martin, Esq. (pro hac vice)
Rhoads & Sinon LLP
One South Market Square, 12th Floor
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
tshill@rhoads-sinon.com
jmartin@rhoads-sinon.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2008, a true and correct copy of the foregoing "Memorandum of Law in Support of Summary Judgment" was filed and served electronically on the following.

Peter Winebrake
THE WINEBRAKE LAW FIRM, LLC
Twining Office Center, Suite 114
715 Twining Road
Dresher, PA  19025
pwinebrake@winebrakelaw.com

I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system, and that parties may access this filing through the Court's system.

*/s/ Todd J. Shill*